## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

| | |
|---|---|
| In re: | Chapter 11 |
| LIGHTNING DOCK GEOTHERMAL HI-01, LLC, *et al.*,[1] | Case No. 17-10567 |
| | (Joint Administration Requested) |
| Debtors. | |

## DECLARATION OF NICHOLAS GOODMAN IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Nicholas Goodman, after first being duly sworn, state as follows:

**Introduction**

1.       I am the Chief Executive Officer of Lightning Dock Geothermal HI-01, LLC, a Delaware limited liability company with its principal place of business in Animas, New Mexico ("Lightning Dock"), and Los Lobos Renewable Power, LLC, a Delaware limited liability company with its principal place of business in Salt Lake City, Utah that owns 100% of the membership interests in Lightning Dock ("Los Lobos"). Lightning Dock and Los Lobos are the debtors and debtors-in-possession in the above-captioned chapter 11 cases (together, the "Debtors"). I am also the Chief Executive Officer of Cyrq Energy, Inc. ("Cyrq Energy"), the Debtors' indirect non-debtor parent company. I have served in the foregoing capacities continuously for the past seven (7) years. In those capacities, I have direct and extensive personal knowledge of the Debtors' day-to-day operations, business, financial affairs, and books and records. I am authorized to submit this Declaration on behalf of the Debtors, and if called upon to testify, I could and would testify competently as to all of the matters set forth herein.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Lightning Dock Geothermal HI-01, LLC (4697) and Los Lobos Renewable Power, LLC (4797). The address of the Debtors' corporate headquarters is 136 S. Main Street, Suite 600, Salt Lake City, UT 84101.

2.      On March 14, 2017 (the "Petition Date"), each of the Debtors commenced cases (together, the "Chapter 11 Cases") by filing petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Mexico (the "Bankruptcy Court"). The Debtors are operating their business and managing their assets as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No creditors' committee, trustee or examiner has been appointed in either of the Chapter 11 Cases.

3.      To minimize the adverse effects of the Chapter 11 Cases on their business and to ensure the Chapter 11 Cases facilitate the Debtors' goal of a successful reorganization, the Debtors have filed multiple motions and pleadings seeking various types of "first day" relief, including debtor-in-possession financing from their ultimate parent, Cyrq Energy (collectively, the "First Day Pleadings").[2] I am familiar with the content of the First Day Pleadings and believe that the relief sought therein is necessary to enable the Debtors to continue to operate in Chapter 11 and preserve their going concern value and is in the best interest of the Debtors and their respective bankruptcy estates.

**General Background**

4.      Lightning Dock owns and operates the first and only utility scale geothermal energy plant in New Mexico, known as the Dale Burgett Geothermal Plant (the "Plant"). The Plant is located in the Animas Valley of southwest New Mexico, approximately 20 miles southwest of Lordsburg, New Mexico. Commissioned in December 2013, the Plant currently has the capacity to generate up to 4 MW of electrical energy, which it sells to Public Service Company of New

---

[2] The "Factual Background" section of each First Day Pleading is hereby incorporated by reference. Terms herein with an initial capital not required by standard capitalization rules, but not parenthetically or otherwise defined herein shall have the meanings ascribed to them in the First Day Pleadings.

Mexico ("PNM") under a long-term power purchase agreement (the "Power Purchase Agreement").

5.    Los Lobos is a holding company whose sole purpose is to hold 100% of the membership interests in Lightning Dock. Non-debtor Raser Power Systems, LLC ("Raser Power") is a holding company whose sole purpose is to own 100% of the membership interest in Los Lobos. Non-debtor Cyrq Energy owns 100% of the membership interests in Raser Power.

6.    Headquartered in Salt Lake City, Utah, Cyrq Energy is a privately held well-capitalized renewable energy company that owns and operates four geothermal energy plants in the Western United States, each of which sells the electrical energy it generates to major utilities or municipalities under long-term power purchase agreements:  Patua, a 25 MW plant in Patua, Nevada, that sells its generation to the Sacramento Municipal Utility District; Thermo No. 1, a 10.3 MW plant in Thermo, Utah that sells its generation the City of Anaheim, California; Soda Lake, a 25 MW plant in Soda Lake, Nevada that sells its generation to NV Energy; and Lightning Dock.  Currently at 4 MW maximum capacity, Lightning Dock is the smallest of Cyrq Energy's geothermal plants and its only geothermal plant in financial distress.  Cyrq Energy has signed agreements to acquire a fifth geothermal energy plant and is in active negotiations for others.

**Assets and Liabilities**

7.    Lightning Dock's principal assets consist of (i) the Power Purchase Agreement, (ii) two geothermal resource leases from the Bureau of Land Management, one for 2,501 acres and one for 640 acres (together, the "Federal Geothermal Leases"), (iii) a fee simple interest in 160 acres of the land above the Federal Geothermal Leases (the "Owned Real Property"), (iv) multiple easements and surface access rights, both contractual and arising under federal law, (v) various water rights, and (vi) the equipment comprising the Plant.

3

8.      Lightning Dock's principal liabilities consist of (i) approximately $700k of general unsecured trade debt owed to domestic vendors, (ii) approximately $100k of local property taxes that likely constitute secured and/or priority claims, and (iii) $25 million principal amount of disputed secured promissory notes (collectively, the "Kaishan Notes") allegedly owed to Kaishan Holding Group Co., Ltd. ("Kaishan Holding"; together with its affiliates, collectively, the "Kaishan Entities"). The Kaishan Notes are secured by (i) a mortgage on two acres of the Owned Real Property on which the Plant was constructed, as shown on **Exhibit A** annexed hereto, (ii) a security interest in substantially all of Lightning Dock's personal property *other than the Federal Geothermal Leases, the Power Purchase Agreement, and Lightning Dock's bank accounts*, and (iii) a pledge of the membership interests in Lightning Dock by Los Lobos.   In addition to the foregoing, Lightning Dock owes Cyrq Energy $9.6 million in principal amount of subordinated unsecured intercompany indebtedness.

9.      Los Lobos's sole asset is the pledged membership interest in Lightning Dock. Los Lobos's sole liability, in addition to the non-recourse liability represented by the pledge of Lightning Dock's membership interests, is a $3 million unsecured note held by Evergreen-FE Lightning Dock, LLC and payable solely out of dividends and distributions, if any, from Lightning Dock.

**Relationship with the Kaishan Entities**

10.     Lightning Dock's Plant was conceived as a two-phase project:  an initial 4 MW plant constructed on two acres of the Owned Real Property ("Phase 1") followed by an 8 MW expansion ("Phase 2"). After resolving multiple nettlesome surface access and water rights issues

and entering into the original version of the Power Purchase Agreement with PNM in April 2012,[3] Lightning Dock began searching for an equipment supplier for Phase 1.

11.     One of Cyrq Energy's paid consultants, Bruce Biederman, introduced Lightning Dock to the Kaishan Entities, which wanted to gain entry to the US market for geothermal energy production equipment for their proprietary screw expander and compressor technology. Lightning Dock commenced due diligence on the Kaishan Entities and their equipment in June 2013, including two trips to China to view installations and a thorough vetting of the Kaishan Entities' technology. Lightning Dock also completed a thorough financial analysis of the Kaishan Entities, and confirmed at least one entity is publicly listed in China, possessed an approximate US$2 billion market capitalization, and was actively pursuing international projects. Unfortunately, Lighting Dock relied extensively on Bruce Biederman as one of the two key people responsible for leading the diligence process for Lightning Dock, including the technical assessment of the Kaishan Entities' technology.

12.     Based on the due diligence lead by Mr. Biederman and his recommendations and advice, negotiations with the Kaishan Entities ensued over the Summer of 2013 and culminated in agreement for Lightning Dock's purchase of the Phase 1 equipment from a Kaishan Entity known as "Zhejiang Tongrong Energy Service Co. Ltd." ("Kaishan Tongrong"). Lightning Dock hired a well-regarded domestic contractor, Industrial Builders, Inc. ("Industrial Builders") to construct Phase 1. Industrial Builders concluded the construction of Phase 1 in December 2013, when the Plant was commissioned and Lightning Dock commenced selling electrical energy to PNM under the Power Purchase Agreement.

---

[3] References to the "Power Purchase Agreement" herein denote the Amended and Restated Geothermal Power Purchase and Sale Agreement, dated as of June 17, 2014.

13.     Phase 1 encountered multiple equipment failures over the course of its first twelve months of operations, including five turbine[4] failures and dozens of liquid pump failures, and suffered significant operating losses (all of which were funded by Cyrq Energy). Nevertheless, based on Mr. Biederman's continued advocacy for the Kaishan Entities and their technology, Lightning Dock entered into an agreement for the purchase of the Phase 2 equipment from Kaishan Tongrong and another Kaishan Entity known as "Zhejiang Kaishan Compressor Co., Ltd." ("Kaishan Compressor"; together with Kaishan Tongrong, the "Kaishan Contractors"). As an additional inducement, the Kaishan Entities offered to facilitate financing for the Phase 2 Equipment and for Lightning Dock to complete the necessary geothermal resource development (e.g., well drilling) for Phase 2.

14.     In June 2014, Lightning Dock issued the Kaishan Notes to CITIC Securities Company Limited (as Fund Manager for and on behalf of CITIC Securities Kai Shan Discovery Fund) ("CITIC"). Although the Kaishan Notes technically were sold to and held by CITIC, Kaishan Holding held all of the economic risk associated with the Kaishan Notes as a result of its agreement to purchase the Kaishan Notes from CITIC upon default.

15.     The Phase 1 and Phase 2 equipment were contractually required to be "utility grade," which generally is understood in the geothermal energy producing industry as meaning a robust design that results in high availability (95% or higher) with major overhauls for components such as turbines once every five years. Lightning Dock experienced eleven (11) turbine failures of the Phase 1 equipment between commissioning of the Plant (in December 2013) and July 2015, and sixteen (16) as of today. These failures, coupled with many other equipment failures and design problems, caused Lightning Dock to continue to suffer significant operating losses,

---

[4] The Kaishan Entities' proprietary technology actually utilizes a screw compressor, but because of its similarity in function to a more traditional turbine, it will be referred to throughout this Declaration as a "turbine."

substantially depleted the remaining proceeds of the Kaishan Notes, and caused defaults under the minimum output provisions of the Power Purchase Agreement.

16.     Lightning Dock attempted to resolve these issues comprehensively by entering into that certain Engineering, Procurement and Construction Contract, dated May 28, 2015, with the Kaishan Contractors (the "EPC Contract").  Under the EPC Contract, the Kaishan Contractors were required *inter alia* to (i) resolve all issues with Phase 1 and bring it up to domestic "utility grade" standards, (ii) construct Phase 2 in accordance with domestic "utility grade" standards, (iii) deliver the Plant, operating in accordance with certain performance specifications, on a "turnkey" basis in accordance with various milestones and deadlines, and (iv) acquire the Kaishan Notes from CITIC.  This last element of the EPC Contract—the Kaishan Contractors' obligation to acquire the Kaishan Notes—was important to Lightning Dock because it would facilitate offset of the Kaishan Notes against monetary damages caused by any defaults by the Kaishan Contractors under the EPC Contract.

17.     Approximately one month after the EPC Contract was executed and the Kaishan Contractors had commenced work, one of Cyrq Energy's directors happened to notice that an email received from the Kaishan Entities' principal Chinese counsel, Ms. Chrystal Sun, during the negotiations over the EPC Contract contained a series of forwarded emails essentially demonstrating corporate espionage by Bruce Biederman.  In the emails (presumably forwarded by mistake by Ms. Sun and copied to the Kaishan Entities' chairman), Mr. Biederman is shown providing extensive strategic advice to the Kaishan Entities in connection with the negotiations over the EPC Contract and dealing with Cyrq Energy and Lightning Dock generally.  Mr. Biederman's and the Kaishan Entities' duplicity is particularly egregious because Mr. Biederman had insisted on actually sitting next to and advising me in my capacity as Lightning

Dock's Chief Executive Officer during negotiations over the EPC Agreement when I was in China. Subsequently, it came to light that Mr. Biederman *had been serving as a director of one of the Kaishan Entities since November 2013* (shortly after the relationship between Lightning Dock and the Kaishan Entities began) and that his nephew—whom Cyrq employed as a technical manager at the Plant on Mr. Biederman's recommendation—had been providing confidential and proprietary information of Lightning Dock to Mr. Biederman in connection with his strategic advice to the Kaishan Entities in their dealings with Lightning Dock and Cyrq Energy. Cyrq Energy and Lightning Dock immediately severed all ties with Mr. Biederman, fired his nephew, and demanded the immediate return of Mr. Biederman's consulting compensation. Mr. Biederman admitted to being a board member of one of the Kaishan Entities and admitted that he had assisted them—in secret, with no disclosure whatsoever to Lightning Dock—in connection with negotiations over the EPC Contract at the very same time he was providing the same services to Lightning Dock on the same issues. Mr. Biederman promptly complied with Lightning Dock's demand for the return of his consulting fees. The Kaishan Entities did not deny receiving advice from Mr. Biederman, but denied knowing that Mr. Biederman was a paid consultant for Lighting Dock and indicated they had severed all ties with Mr. Biederman in any event. Based on publicly available information, however, Mr. Biederman remains a director of one of the Kaishan Entities even today.

18. Based on the Biederman espionage (in which the Kaishan Entities knowingly and voluntarily participated, as demonstrated by the inadvertently forwarded emails) and as a result of the continued failures of the Kaishan Entities' purportedly "utility grade" equipment, Lightning Dock grew concerned that everything it had been led to believe about the suitability of the Kaishan Entities' proprietary turbine and compressor technology for geothermal energy production was

8

false. Lightning Dock began hiring outside consultants to review and assess the technology. Those consultants quickly identified several, major design flaws, the first and most significant of which was the use of a faulty bearing design in the turbines. When presented with this information, the Kaishan Entities admitted both the design defect and that they were trying to hide the defect until all of the necessary bearings could be replaced. Notwithstanding the bearing replacements, Lightning Dock continued to experience multiple equipment failures, dozens of failed liquid pumps, and an additional four failed turbines whose bearings had been updated. In all, Lightning Dock has experienced 16 complete failures of purportedly "utility grade" turbines in a 30-month period. An even more profound incident in this period included a generator failure. One of the many design deficiencies Lightning Dock has identified is the deployment of generators not suited for outdoor deployment in a dusty dessert environment. The generators provided are really more suited for deployment in a powerhouse or protected environment. In October 2015, one of the generators failed and resulted in a unit shutting down and excessive smoke. After inspecting the generator, Kaishan Entities' personnel decided to restart the unit, a gross violation of all safety and common sense practices. The generator erupted in flames damaging surrounding equipment and causing a life-threatening event. This decision is illustrative of the Kaishan Entities' approach to both safety and design for this project.

19.     In another egregious episode during the course of the Kaishan Entities' performance of the EPC Contract, the fraud prevention unit of the U.S. Department of State notified Lightning Dock in December 2015 that the Kaishan Entities apparently had forged a Lightning Dock executive's signature on multiple visa documents in order to bring workers over from China illegally. In January 2016, the Kaishan Entities admitted the wrongdoing and apologized. Lightning Dock subsequently became the subject of a federal immigration

investigation that required the employment of outside immigration counsel. In my 25 years of executive experience in the energy industry, during which I have dealt with numerous international companies, I have never witnessed such a serious intentional violation of international law by a contract counterparty.

20.     Most significantly, the Kaishan Contractors committed multiple material defaults under the EPC Contract by failing to design and construct the Plant in accordance with domestic "utility grade" standards and failing to meet deadlines and milestones for the "turnkey" delivery of Phases 1 and 2. Lightning Dock repeatedly requested standard design information and an opportunity to review the design with domestic engineers to ensure design issues from Phase 1 had been resolved. Although the Kaishan Contractors did provide some drawings, they were mostly in Chinese, contained numerous mistakes and inaccuracies, and most importantly, were provided after the Kaishan Contractors already had manufactured the Phase 2 equipment, eliminating any opportunity to correct or amend the faulty designs.

21.     Thus, rather than achieve a comprehensive resolution of issues with the Kaishan Entities and the Plant, the EPC Contract was a complete failure, marred not only by multiple material defaults by the Kaishan Contractors, further jeopardizing Lightning Dock's ability to cure the ongoing minimum output defaults under the Power Purchase Agreement, but by truly egregious and in at least one case, patently illegal conduct by the Kaishan Entities. In assessing all available options, it became very clear to me that we could not continue to allow a company that hired our employees and consultants to use them against us, repeatedly broke domestic laws pertaining to immigration and site safety, provided non-utility grade and in some cases unsafe equipment, and generally demonstrated no ability or even desire to adhere to domestic utility grade standards to continue working on the Plant. As a result, on March 2, 2016, Lightning Dock terminated the EPC

Contract and demanded that the Kaishan Contractors remove the Phase 2 equipment from the Owned Real Property.

**Litigation with the Kaishan Entities**

22.     In light of the Kaishan Contractors' complete failure to perform under the EPC Contract and Lightning Dock's increasingly precarious financial condition, Lightning Dock refused to make any further payments on the Kaishan Notes. As a result, in March 2016, one of the Kaishan Entities, Kaishan Holding, filed suit against Lightning Dock in the United States District Court for the Southern District of New York seeking recovery on the Kaishan Notes (the "New York Litigation").[5]

23.     Lightning Dock responded to the New York Litigation by filing counterclaims against Kaishan Holding and third-party claims against the Kaishan Contractors, principally for the purpose of offsetting the substantial damages Lightning Dock has incurred and continues to incur as a result of the Kaishan Contractors' failure to perform under the EPC Contract and deliver a utility grade plant on a turnkey basis. As the basis for offset, Lightning Dock relies on the express requirement of the EPC Contract that the Kaishan Contractors acquire and hold the Kaishan Notes, thereby establishing the requisite mutuality.

24.     Kaishan Holding has sought dismissal of Lightning Dock's counterclaims on the ground that it, rather than the Kaishan Contractors, acquired the Kaishan Notes, and that as a result, the requisite mutuality for offset is lacking. Even though Kaishan Holding and the Kaishan Contractors are affiliates and notwithstanding the EPC Contract's express requirement that the Kaishan Contractors acquire the Kaishan Notes, Kaishan Holding maintains that any claims for

---

[5] *Zhejiang Kaishan Holding Group Co., Ltd. v. Lightning Dock Geothermal HI-01, LLC*, Case No. 16-01572. Initially, Kaishan Holding's complaint sought only a missed interest payment. Subsequently, it was amended to seek the entire outstanding accelerated balance of the Kaishan Notes.

breach of the EPC Contract are solely against the Kaishan Contractors and that, as a result, such claims cannot serve as a basis for defending against payment of the Kaishan Notes.

25. The Kaishan Contractors have defended against Lightning Dock's third-party claims by invoking an arbitration clause in the EPC Contract and initiating an arbitration against Lightning Dock in the London Court of International Arbitration (the "London Arbitration").[6]

26. By means of their pincer litigation strategy, the Kaishan Entities essentially have taken the position that Lightning Dock must pay the Kaishan Notes to Kaishan Holding, then seek to recover damages for breach of the EPC Contract from the Kaishan Contractors in the London Arbitration. And by forcing Lightning Dock to conduct litigation simultaneously on two different fronts, the Kaishan Entities are forcing Lightning Dock to commit substantial resources, economic and otherwise, to litigation that does not resolve the continuing equipment failures at the Plant, cure the minimum output defaults under or otherwise serve to preserve the Power Purchase Agreement that is the economic cornerstone of Lightning Dock. Absent near term resolution, the dual-front litigation threatens the future of the project, including the many full time jobs at the plant, secondary jobs provided by vendors and suppliers in the region, and the overall economic contribution the project provides to both the local and greater New Mexico community.

27. Despite the substantial fees incurred to date, neither the New York Litigation nor the London Arbitration has proceeded very far. Nothing other than motion practice has occurred in the New York Litigation, and no preliminary hearing has yet been held in the London Arbitration. No discovery has taken place in either proceeding. Thus, but for the automatic stay, both proceedings would continue for a protracted period and serve merely to exacerbate Lightning Dock's financial losses without solving any of its problems.

---

[6] *Zhejiang Kaishan Compressor Co. Ltd. and Zhejiang Tongrong Energy Service Co. Ltd. v. Lightning Dock Geothermal HI-01, LLC*, Arbitration No. 163455.

28.     Shortly before the Petition Date, Lightning Dock received word from multiple sources that Kaishan Holding was commencing proceedings to foreclose its liens and security interests, leaving the Debtors with no choice but to file the Chapter 11 Cases.

**Repowering of the Plant and the Exclusivity Agreement**

29.     As a result of the Kaishan Contractors' defaults under the EPC Contract, Phase 1 does not consistently generate projected levels of electrical energy, Lightning Dock experiences significant operating losses every month, Phase 2 has not been constructed, and Lightning Dock has failed to meet the minimum output requirements specified in the Power Purchase Agreement. To rectify that situation and comply with the Power Purchase Agreement's requirements, Lightning Dock needs to "repower" the Plant with utility grade power generation equipment.

30.     To that end, Lightning Dock solicited proposals from and negotiated with multiple utility grade geothermal energy equipment suppliers for the repowering of the Plant. Immediately before the filing of the Chapter 11 Cases, Lightning Dock selected a repowering proposal from Turboden S.r.l., a Mitsubishi affiliate ("Turboden"), and entered into a 30-day exclusive negotiations agreement with Turboden (the "Exclusivity Agreement"). As part of the First Day Pleadings, Lightning Dock has filed its Repowering Motion (as defined below) seeking (i) immediate assumption of the Exclusivity Agreement under section 365(a) of the Bankruptcy Code, (ii) immediate authority to negotiate definitive agreements with Turboden, and (iii) after notice and a hearing, to approve Lightning Dock's execution, delivery and performance of such definitive agreements, as well as related construction contracts with Industrial Builders (collectively, the "Repowering Contracts"). It is anticipated the hearing on approval of Lightning Dock's execution, delivery and performance of the definitive agreements will be scheduled contemporaneously with a hearing on final approval of the DIP Financing (as defined below).

**Amendment No. 1 to the Power Purchase Agreement**

31.     Because the security documents for the Kaishan Notes contain an after-acquired property clause that would subject all new power generation equipment to the security interests securing the Kaishan Notes, Lightning Dock cannot effectuate a repowering of the Plant with utility grade equipment outside of the Chapter 11 Cases and without the benefit of section 552 of the Bankruptcy Code.

32.     The Power Purchase Agreement, however, constitutes a "forward contract" within the meaning of section 556 of the Bankruptcy Code. Thus, absent an agreement to the contrary, the Power Purchase Agreement's "termination upon bankruptcy" provision would be fully enforceable, and PNM would have been entitled to terminate the Power Purchase Agreement on the Petition Date.

33.     In addition, the Kaishan Contractors' default under the EPC Contract has caused Lightning Dock to continue to be in default under the minimum output provisions of the Power Purchase Agreement, rendering it subject to termination by PNM at any time absent agreement providing for the cure of those defaults. Without an amendment of the Power Purchase Agreement allowing additional time to complete the repowering of the Plant and meet the Power Purchase Agreement's minimum output provisions, there is really very little value available for any of the Debtors' stakeholders.

34.     To obtain the benefit of section 552 of the Bankruptcy Code, resolve the minimum output defaults under the Power Purchase Agreement, and facilitate the Plant repowering without risking PNM's termination of the Power Purchase Agreement, Lightning Dock negotiated with PNM over the course of approximately eight weeks leading up to the Petition Date with regard to the conditions under which PNM would forbear from exercising its termination rights either as a

result of a Lightning Dock bankruptcy filing or as a result of Lightning Dock's inability to satisfy the minimum output requirements of the Power Purchase Agreement. Those negotiations culminated shortly before the Petition Date in the execution of Amendment No. 1 to the Power Purchase Agreement ("Amendment No. 1"). PNM's willingness to enter into an amendment provides a limited window of opportunity to salvage the project and preserve the economic benefit it confers upon New Mexico.

35. Salient provisions of Amendment No. 1 are:

- PNM agrees to forbear from exercising termination rights for five business days from the Petition Date.

- If the Power Purchase Agreement, as amended by Amendment No. 1, is assumed under section 365(a) on the terms set forth in a negotiated assumption order prior to the expiration of the five-business day forbearance period, the remainder of Amendment No. 1 will become effective.

- Remainder of Amendment No. 1:

  - Permanently eliminates PNM's right to terminate the Power Purchase Agreement based on the filing of the Chapter 11 Cases.

  - Eliminates PNM's right to terminate the Power Purchase Agreement as a result of minimum output defaults until the repowering is complete.

  - Requires that the Plant be repowered with "a single utility grade turbine or generator…regularly used at other binary geothermal plants in the United States."

  - Requires that regulatory approval for Amendment No. 1 be obtained prior to January 31, 2018.

  - Requires that the repowering be completed within 18 months of regulatory approval of Amendment No. 1.

  - Requires that on or prior to April 15, 2017, Lightning Dock obtain final approval of debtor-in-possession financing in an amount and on terms sufficient to complete the repowering on a timely basis.

  - Requires on or prior to July 31, 2017, either (i) confirmation of a plan of reorganization for Lightning Dock or (ii) approval of a sale of Lightning Dock's assets to a purchaser approved by PNM.

- Reduces the price paid for energy by PNM.

36. To comply with the requirements of Amendment No. 1 (which is critical to Lightning Dock's ability to preserve the Power Purchase Agreement), Lightning Dock has filed a motion to assume the Power Purchase Agreement, as amended by Amendment No. 1, as one of the First Day Pleadings. That motion seeks to have the negotiated assumption order entered at the hearing on the First Day Pleadings.

37. Entry of the negotiated assumption order at the hearing on the First Day Pleadings is necessary to avoid immediate and irreparable harm to the Debtors. Absent that relief, PNM will be free to terminate the Power Purchase Agreement within a day or so after the hearing on the First Day Pleadings. Termination of the Power Purchase Agreement, in turn, would permanently eliminate the economic viability of the repowering of the Plant and any possibility of Lightning Dock's successful restructuring or sale of its assets. Conversely, any rational plan sponsor or purchaser of Lightning Dock's assets will want the Power Purchase Agreement, as amended by Amendment No. 1, given its favorable pricing and terms. Moreover, because of the extended "freeze" currently in place in the market for long-term geothermal power purchase agreements, no comparable power purchase agreement is likely to be available for some time.

**The DIP Financing**

38. Cyrq Energy has offered to provide to the Debtors a post-petition, secured financing facility (the "DIP Financing") to provide funding for (i) the Repowering Contracts; (ii) the Debtors' operating deficits pending completion of the repower; and (iii) administrative expenses of the Chapter 11 cases.

39. The DIP Financing consists of a multiple-draw term loan facility in the maximum principal amount of $32.5 million plus interest and fees, of which $700,000 will be available on an interim basis (the "Initial Loan"), subject to the terms and conditions of a debtor-in-possession

16

credit agreement in substantially the form annexed to the DIP Financing Motion (as defined below) (the "DIP Financing Agreement"). The other $31.8 million in principal amount of the DIP Financing will be available after, among other things, entry of a final order approving the DIP Financing.

40. Other salient provisions of the DIP Financing include:[7]

- Conditions to funding:

  - Initial Loan conditioned on entry of an order granting the PPA Assumption Motion (as defined below).

  - Subsequent loans conditioned on entry of final orders, on or before April 15, 2017, (i) approving the DIP Financing and (ii) approving Lightning Dock's execution and delivery of the Repowering Contracts.

- The DIP Financing is secured by:

  - First-priority liens on all assets that are not subject to existing valid, perfected, unavoidable security interests as of the Petition Date, including without limitation (subject to a final order) liens on chapter 5 avoidance actions and the proceeds thereof.

  - Junior liens on all assets that are subject to existing valid, perfected, unavoidable security interests as of the Petition Date.

  - Super-priority administrative expense claims against the Debtors' bankruptcy estates.

- Unencumbered assets include (i) the Federal Geothermal Leases; (ii) all but approximately two (2) acres of the Owned Real Property; and (iii) the Power Purchase Agreement.

- Interest rate of 7.0%; default interest rate of 9.0%.

- Commitment fee equal to 3.0% of the total commitment fully earned upon entry of an interim order approving the DIP Financing; unused line fee equal to 0.375% payable monthly.

---

[7] This summary is intended to assist the Bankruptcy Court in understanding key aspects of the arrangement and is qualified in its entirety by reference to the DIP Financing Agreement. All capitalized terms not otherwise defined in this description have the meanings given to them in the DIP Financing Agreement.

- Section 506(c) waiver effective upon entry of a final order approving the DIP Financing.

- Events of Default include:

  - Failure to obtain an order granting the PPA Assumption Motion within five (5) business days of the Petition Date.

  - Failure to obtain entry of final orders approving the DIP Financing and approving the execution and delivery of the Repowering Contracts by April 15, 2017.

  - Occurrence of any default under the Repowering Contracts.

  - The Power Purchase Agreement, as amended by Amendment No. 1, is terminated, or any event of default occurs thereunder on account of which PNM may terminate the Power Purchase Agreement.

  - The granting of relief from the automatic stay to permit the New York Litigation or the London Arbitration, or any other litigation against the Debtors, outside the Bankruptcy Court.

  - Entry of an order confirming a plan or approving a sale of substantially all assets without providing for payment of the balance of the DIP Financing.

  - Occurrence of a Change of Control.

### First Day Pleadings

A. **Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Post-Petition Financing, (II) Granting Dip Facility Liens and Super-Priority Claims, and (III) Scheduling a Final Hearing Pursuant to Fed R. Bankr. P. 4001(b) and (c) ("DIP Financing Motion")**

41.     Through the DIP Financing Motion, the Debtors seek interim and final orders authorizing the DIP Financing from Cyrq Energy described above.

42.     During the period leading up to the Petition Date, the Debtors engaged in a search for alternative sources of debtor-in-possession financing. The Debtors retained RPA Advisors, LLC ("RPA"), the Debtors' proposed financial advisor, to solicit offers for post-petition financing from third parties. RPA has significant experience in the power generation space including multiple assignments on geothermal and renewable energy projects.

18

43.     RPA worked closely with the Debtors' Chief Financial Officer and counsel to prepare the budget which is annexed as Exhibit C to the DIP Financing Motion. The Budget is sufficient and appropriate for the Debtors' financing needs, including to repower the Plant.

44.     I understand that RPA solicited financing proposals from sixteen (16) parties that potentially would have an interest in providing post-petition financing. I also understand that, although three parties executed non-disclosure agreements and conducted some due diligence, none of the solicited parties ultimately were interested in moving forward with a discussion regarding post-petition financing.

45.     Accordingly, the Debtors and RPA have concluded that the DIP Financing offered by Cyrq Energy is the only available form of financing that will meet the Debtors' needs.

**B.     Emergency Motion for Entry of an Order Pursuant to Bankruptcy Code Sections 365 and 105 Authorizing Debtors to Assume Amended and Restated Geothermal Power Purchase and Sale Agreement as Amended by Amendment No. 1 Thereto ("PPA Assumption Motion")**

46.     Through the PPA Assumption Motion, the Debtors seek entry of an order authorizing and directing assumption of the Power Purchase Agreement.

47.     As described above, PNM will be free to terminate the Power Purchase Agreement if not assumed within five (5) business days of the Petition Date. Termination of the Power Purchase Agreement, in turn, would permanently eliminate the economic viability of the repowering and possibility of Lightning Dock's successful restructuring or sale of its assets. Conversely, any rational plan sponsor or purchaser of Lightning Dock's assets will want the Power Purchase Agreement, as amended by Amendment No. 1, given its favorable pricing and terms. Moreover, because of the extended "freeze" currently in place in the market for long-term geothermal power purchase agreements, no comparable power purchase agreement is likely to be available for some time.

C.  **Motion for Entry of an Order (I) Approving Immediate Assumption of Exclusivity Agreement with Turboden S.R.L., (II) Authorizing Debtors to Negotiate Definitive Repowering Contracts, and (III) Authorizing Entry into Repowering Contracts After Notice and a Hearing ("_Repowering Motion_")**

48.     Through the Repowering Motion, the Debtors seek entry of an order authorizing and directing (i) immediate assumption of the Exclusivity Agreement under section 365(a) of the Bankruptcy Code, (ii) immediate authority to negotiate definitive agreements with Turboden, and (iii) after notice and a hearing, to approve Lightning Dock's execution, delivery and performance of the Repowering Contracts.

49.     As set forth above, Amendment No. 1 requires that repowering the Plant must be achieved within 18 months of regulatory approval of Amendment No. 1. Prompt entry into the Repowering Contracts is both necessary to meet that timeline and an express requirement under the DIP Financing.

50.     Lightning Dock solicited proposals from and negotiated with multiple utility grade geothermal energy equipment suppliers for the repowering of the Plant prior to selecting the repowering proposal from Turboden and entering into the Exclusivity Agreement.

51.     Entry into the Exclusivity Agreement paves the way for the Debtors to finalize these crucial Repowering Agreements and timely commence the repowering process.

D.  **Motion for Entry of an Order (I) Prohibiting Utilities From Altering, Refusing or Discontinuing Service (II) Approving Debtors' Proposed Adequate Assurance of Payment for Future Utility Services; (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests; and (IV) Granting Related Relief ("_Utility Motion_")**

52.     Through the Utility Motion, the Debtors seek entry of an order (i) prohibiting utility service providers from altering, refusing or discontinuing services, or discriminating against the Debtors on account of commencement of these Chapter 11 Cases or unpaid prepetition invoices; (ii) approving the Debtors' proposed form of adequate assurance deposits, as described herein, to

provide the utilities with adequate assurance of payment for post-petition services within the meaning of section 366 of the Bankruptcy Code; (iii) approving the Debtors' proposed procedures for resolving disputes regarding adequate assurance; and (iv) granting related relief.

53.     In the normal course of their business, the Debtors obtain wheeling/transmission, electric, telephone and other similar utility services (collectively, "Utility Services") including from those entities identified on Exhibit B to the Utilities Motion (the "Utility Companies").  The Debtors pay the Utility Companies, on average, approximately $58,000 per month for services rendered.  To the best of my knowledge, prior to the commencement of these Chapter 11 Cases, the Debtors generally were current with respect to undisputed invoices for Utility Services.

54.     The Utility Services are essential to the Debtors' ability to sustain their operations while their Chapter 11 Cases are pending and, therefore, to the success of the Debtors' reorganization or liquidation.  Any interruption of Utility Services, even for a brief period, would severely disrupt the Debtors' business operations and would be extremely harmful to their customer relationships, revenues, profits, and ultimately their ability to maximize the recovery for their stakeholders, whether through a reorganization or a liquidation.  It is therefore critical that all Utility Services continue uninterrupted.

55.     Based upon cash flow from operations, existing utility deposits, and borrowings under their DIP Financing, the Debtors expect to have ample liquidity to pay timely all post-petition obligations owed to the Utility Companies.  However, to provide adequate assurance to the Utility Companies as required under section 366(c) of the Bankruptcy Code, the Debtors propose to provide a deposit equal to the value of one (1) week of Utility Services provided by the Utility Company, based upon the historical average over the twelve (12) months immediately

preceding the Petition Date (the "Adequate Assurance Deposit"), but only if the Utility Company does not hold an existing deposit equal to or greater than the Adequate Assurance Deposit.

56.     The existing deposits, average monthly invoice, and proposed adequate insurance deposit for each Utility Company is listed on Exhibit B to the Utility Motion.  I believe that the proposed adequate assurance payments constitute sufficient adequate assurance to the Utility Companies.

**E.     Motion for Interim and Final Orders Pursuant to Sections 105(a), 345(b) and 363(c)(1) of the Bankruptcy Code (I) Authorizing Continued Maintenance of Existing Bank Accounts; (II) Authorizing Continued Use of Existing Checks and Business Forms; and (III) Waiving the Requirements of Section 345(b) of the Bankruptcy Code ("Cash Management Motion")**

57.     Through the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing the continued maintenance of existing bank accounts, (ii) authorizing the continued use of existing checks and business forms, and (iii) waiving the requirements of section 345(b) of the Bankruptcy Code.

58.     As of the Petition Date, the Debtors each maintain a single general operating account in the ordinary course of their business at Wells Fargo Bank, N.A., which are identified on Exhibit C to the Cash Management Motion.

59.     Lightning Dock's sole source of revenue is the stream of payments it receives from PNM under the Power Purchase Agreement.  Prior to the Petition Date, Lightning Dock invoiced PNM in accordance with section 4.02(a) of the Power Purchase Agreement, and PNM paid Lightning Dock via monthly wire transfer to Lightning Dock's account specified in Exhibit C to the Cash Management Motion.

60.     Prior to receiving funds from PNM, Lightning Dock personnel calculated the amount of expenses that would have to be paid from the account for the month at issue.  If

anticipated payments from PNM were insufficient to cover expenditures, then Lightning Dock would request an intercompany loan from its affiliate Cyrq Energy to cover the difference.[8]

61.    After receipt of the PNM funds via wire transfer, Cyrq Energy would wire transfer to the Lightning Dock account any additional amounts necessary to cover the Debtors' expenses. Lightning Dock would then issue checks and initiate ACH payments and wire transfers to its suppliers and vendors (including transmitting utilities, parts suppliers, and dozens of other payees) to cover expenses.  All corporate and administrative expenses are paid out of the Lightning Dock account.

62.    The Debtors make and receive hundreds of payments per year, and over $6 million in cash flows through the Lightning Dock account annually.

63.    In the ordinary course of their business, the Debtors use a variety of checks and other pre-printed business forms (collectively, the "Business Forms").  Because of the nature and scope of the Debtors' business operations and the number of suppliers of goods and services with whom the Debtors transact business on a regular basis, it is important that the Debtors be permitted to continue to use their Business Forms without alteration or change.

64.    Use of Business Forms substantially in the forms existing immediately before the Petition Date, without reference to their status as debtors-in-possession would avoid disruption of the Debtors' cash management system and unnecessary expense.

_____

[8] Cyrq Energy has agreed to continue funding operating deficits as DIP lender subject to the terms of a DIP Financing Agreement.  The Debtors have moved for authorization to enter into the DIP Financing Agreement as set forth above.

**F.** **Motion of the Debtors and Debtors-in-Possession for Entry of an Order Establishing Notice and Service Procedures ("Notice Procedures Motion")**

65. Through the Notice Procedures Motion, the Debtors seek entry of an order establishing certain notice and service procedures in connection with the administration of the Chapter 11 Cases.

66. I expect that there will be numerous parties-in-interest in these Chapter 11 Cases and anticipate that a significant number of parties will file requests for service of filings. I also expect that numerous motions and applications will be filed in these cases.

67. Given the size and scope of the Chapter 11 Cases, manual service of all pleadings and other papers filed in these cases on each creditor and party-in-interest is unnecessary, and would be extremely burdensome and costly to the Debtors' estates as a result of photocopying and postage expenses as well as other expenses associated with such large mailings.

68. I believe the proposed notice procedures will maximize the efficiency and orderly administration of these Chapter 11 Cases, while at the same time ensuring that appropriate notice is provided, particularly to parties that have expressed an interest in these cases and those directly affected by any requested relief.

**G.** **Motion to Authorize Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only Pursuant to Federal Rule of Bankruptcy Procedure 1015(b) ("Joint Administration Motion")**

69. Through the Joint Administration Motion, the Debtors seek entry of an order authorizing and directing the joint administration of the Debtors' related chapter 11 cases for procedural purposes

70. Joint administration of the Debtors' estates will be less costly and burdensome than the separate administration of the estates. For example, joint administration will permit the use of

Case 17-10567-t11    Doc 9    Filed 03/14/17    Entered 03/14/17 17:01:18 Page 24 of 27

a single, general docket for the Debtors' cases and combined notices to creditors and other parties-in-interest of the Debtors' respective estates.

71.     The Debtors anticipate that numerous filings and additional matters, including notices, applications, motions, orders, hearings and other proceedings will be made, issued or convened in these cases. Some of these matters will affect both Debtors. Joint administration will protect parties-in-interest by ensuring that parties affected by each of the Debtors' respective chapter 11 cases will be apprised of the various matters before the Court in those cases.

72.     Joint administration of the Debtors' estates also will avoid repetitive, duplicative and potentially confusing filings by permitting counsel for all parties-in-interest to (i) use a single caption on the numerous documents that will be filed and served in the Debtors' cases, and (ii) file many documents in only one of the Debtors' cases rather than in both cases. Schedules of assets and liabilities, statements of financial affairs, and proofs of claims will be captioned and filed in each of the Debtors' respective, separate cases, as appropriate.

73.     Moreover, joint supervision of the administrative aspects of the Chapter 11 Cases by the office of the U.S. Trustee and the Court will be simplified. As such, joint administration will promote the economical and efficient administration of the Debtors' estates to the benefit of the Debtors, creditors, the office of the U.S. Trustee and the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: March 14, 2017                       /s/ Nicholas Goodman
                                            Nicholas Goodman
                                            Chief Executive Officer

**EXHIBIT A**



GEOTHERMAL ROAD

**LEGEND**

☐ Mortgaged Property-2.323 acres

— Lightning Dock Geothermal HI-01, LLC
   Property Boundary-160 acres

LIGHTNING DOCK GEOTHERMAL HI-01, LLC SITE MAP

SCALE

Feet