# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| LIGHTNING DOCK GEOTHERMAL HI-01, LLC, *et al.*,[1] | ) ) ) | Case No. 17-10567 |
|  | ) | (Joint Administration Requested) |
| Debtors. | ) ) | |

## MOTION FOR ENTRY OF INTERIM AND
## FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN
## POST-PETITION FINANCING, (II) GRANTING DIP FACILITY LIENS
## AND SUPER-PRIORITY CLAIMS, AND (III) SCHEDULING A
## FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)

The debtors and debtors-in-possession (together, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), by their proposed undersigned counsel, hereby move (the "Motion") for entry of an interim order, in substantially the form attached hereto as **Exhibit A** (the "Interim Order") and a final order, in substantially the form attached hereto as **Exhibit B** (the "Final Order"), (i) authorizing the Debtors to obtain post-petition financing on a secured, super-priority basis pursuant to sections 105, 363, 364 and 507 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and granting certain related relief, and (ii) scheduling a final hearing on this Motion pursuant to Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In support of this Motion, the Debtors rely on the *Declaration of Nicholas Goodman in Support of Chapter 11 Petitions and Related Motions* (the "Goodman Declaration"),[2] and the *Declaration of Chip Cummins in Support of DIP*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Lightning Dock Geothermal HI-01, LLC (4697) and Los Lobos Renewable Power, LLC (4797). The address of the Debtors' corporate headquarters is 136 S. Main Street, Suite 600, Salt Lake City, UT 84101.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Goodman Declaration.

*Financing and Assumption of Amended Power Purchase Agreement* (the "<u>Cummins Declaration</u>"), each of which is incorporated herein by reference. In further support of this Motion, the Debtors respectfully state as follows:

## I. <u>Jurisdiction, Venue and Predicates for Relief</u>

1.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b). Venue of this proceeding and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.  The predicates for the relief requested herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014.

## II. <u>Background</u>

3.  On March 14, 2017 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Mexico (the "<u>Court</u>"), commencing the Chapter 11 Cases. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have, pursuant to a separate motion, moved this Court for entry of an order authorizing the joint administration of these Chapter 11 Cases.

4.  No request for the appointment of a trustee or an examiner has been made in these cases and no statutory committees have been appointed or designated.

5.  A description of the Debtors' business operations, corporate structures, capital structures, and reasons for commencing these Chapter 11 Cases is set forth in the Goodman Declaration. Additional facts in support of the specific relief sought herein are set forth below.

### III.  The Amended PPA and the Proposed DIP Facility

6.     Debtor Lightning Dock Geothermal HI-01, LLC ("Lightning Dock") owns and operates the first and only utility scale geothermal energy plant in New Mexico, known as the Dale Burgett Geothermal Plant (the "Plant").  The Plant is located in the Animas Valley of southwest New Mexico, approximately 20 miles southwest of Lordsburg, New Mexico.  Debtor Los Lobos Renewable Power, LLC is a holding company whose sole purpose is to hold 100% of the membership interests in Lightning Dock.  Commissioned in December 2013, the Plant currently has the capacity to generate up to 4MW of electrical energy, which it sells to Public Service Company of New Mexico ("PNM") under a long term power purchase agreement (the "Power Purchase Agreement").

7.     As discussed in the Goodman Declaration, these Chapter 11 Cases result from defects in equipment at the Plant manufactured and installed by Zhejiang Tongrong Energy Service Co. Ltd. and Zhejiang Kaishan Compressor Co. Ltd. (together, the "Kaishan Contractors").  Due to these defects, Lightning Dock has been unable to meet the minimum output requirements specified in under the Power Purchase Agreement.  To rectify that situation and comply with the Power Purchase Agreement's requirements, Lightning Dock needs to "repower" the Plant with utility grade power generation equipment.

8.     The purpose of these Chapter 11 Cases is to effectuate the repowering of the Plant and thereby preserve the Power Purchase Agreement, which is the economic cornerstone of Lightning Dock's business.

9.     The Power Purchase Agreement constitutes a "forward contract" within the meaning of sections 556 of the Bankruptcy Code.  Thus, absent an agreement to the contrary, the Power Purchase Agreement's "termination upon bankruptcy" provision would be fully

enforceable, and PNM would have been entitled to terminate the Power Purchase Agreement on the Petition Date.

10.     To preclude that possibility, Lightning Dock negotiated with PNM over the course of approximately eight weeks leading up to the Petition Date with regard to the conditions under which PNM would forbear from exercising its termination rights, either as a result of a Lightning Dock bankruptcy filing or as a result of Lightning Dock's inability to satisfy the minimum output requirements of the Power Purchase Agreement. Those negotiations culminated shortly before the Petition Date in the execution of Amendment No. 1 to the Power Purchase Agreement ("Amendment No. 1").

11.     By Amendment No. 1, PNM agreed to forbear from exercising its termination rights due to Lightning Dock's bankruptcy filing if certain conditions are met. Among other things, Amendment No. 1 requires that Lightning Dock obtain entry of an order (the "Assumption Order") approving assumption of the Power Purchase Agreement, as amended by Amendment No. 1 (the "Amended PPA") within five (5) business days of the Petition Date. The Debtors have filed a motion seeking entry of the Assumption Order contemporaneously with this Motion.

12.     Other salient provisions of Amendment No. 1, that become effective if assumption is granted within the time limits set forth therein are:

- Permanently eliminates PNM's right to terminate the Power Purchase Agreement based on the filing of the Chapter 11 Cases.

- Eliminates PNM's right to terminate the Power Purchase Agreement as a result of minimum output defaults until the repowering is complete.

- Requires that the Plant be repowered with "a single utility grade turbine or generator…regularly used at other binary geothermal plants in the United States" ("Repower" or "Repowering").

- Requires that regulatory approval for Amendment No. 1 be obtained prior to January 31, 2018.

- Requires that the repowering be completed within 18 months of regulatory approval of Amendment No. 1.

- Requires that on or prior to April 15, 2017, Lightning Dock obtain final approval of debtor-in-possession financing in an amount and on terms sufficient to complete the repowering on a timely basis.

- Requires prior to July 31, 2017, either (i) confirmation of a plan of reorganization for Lightning Dock or (ii) approval of a sale of Lightning Dock's assets to a purchaser approved by PNM.

- Reduces the price paid for energy by PNM.

13.     In order to comply with Amendment No. 1, the Debtors currently are negotiating equipment purchase and related construction contracts to repower the Plant (together, the "Repowering Contracts") and, contemporaneously with this Motion, have filed a motion seeking approval for Lightning Dock's execution and delivery of those Repowering Contracts.

14.     Amendment No. 1 allows PNM to terminate the Amended PPA if the Debtors do not secure post-petition financing reasonably sufficient to enable Lightning Dock to timely complete the Repowering of the Plant. Any hope for a going concern reorganization of the Debtors will be irretrievably lost if PNM terminates the Power Purchase Agreement.

15.     Cyrq Energy, Inc. (the "DIP Lender"), which owns a 100% membership interest in each of the Debtors, has offered to provide to the Debtors a post-petition, secured financing facility (the "DIP Facility") to address (i) funding for the Repowering Contracts; (ii) the Lightning Dock's operating deficits pending completion of the Repower; and (iii) administrative expenses of the Chapter 11 cases.

16.     The Debtors retained RPA Advisors, LLC ("RPA"), the Debtors' proposed financial advisor, to solicit offers for post-petition financing from third parties. RPA has

significant experience in the power generation space including multiple assignments on geothermal and renewable energy projects. *See* Cummins Decl. at ¶ 3. RPA worked closely with the Debtors' Chief Financial Officer and counsel to prepare the budget which is annexed as **Exhibit C** to this Motion (the "Budget"). *Id*. at ¶ 6. The Budget is sufficient and appropriate for the Debtors' financing needs, including the Repowering. *Id*.

17.     RPA commenced the solicitation process by contacting parties that potentially would have an interest in providing post-petition financing. On February 21, 2017, based on the Budget, "teaser" emails were sent soliciting financing proposals from sixteen (16) parties. *See* Cummins Decl. at ¶ 7. The solicited parties ranged from industry participants, to traditional lenders, to lenders specializing in DIP Financing. *Id*. Of the solicited parties, RPA received firm responses of "Not Interested" from two (2) parties, and indications of interest from two (2) parties. *Id*. Twelve (12) parties did not respond to the initial email. *Id*. Non-disclosure agreements ("NDAs") to facilitate the sharing of information regarding the Debtors' business were sent to the two parties that expressed indications of interest, but only one party executed and returned an NDA. *Id*.

18.     On March 7 and 8, 2017, follow-up e-mails were sent to the parties who had initially failed to respond to the first "teaser" email. *See* Cummins Decl. at ¶ 8. In response to this email, five additional parties stated a clear "Not Interested." One party responded that it may be interested and would forward the email to someone with greater industry expertise within the company. *Id*. There has been no follow-up from this party since that correspondence. *Id*. Another party referred RPA to others in their institution and has signed an NDA. *Id*. Five of the initially contacted parties never responded to either communication sent. *Id*.

19. On March 13, 2017, discussions were held with one of the parties that signed the NDA. *Id*. at 9. Upon discussing this opportunity further within their institution and receiving additional information on the DIP Financing that is being solicited, such party declared that it was no longer interested in moving forward with this potential opportunity. *Id*.

20. Also on March 13, 2017, discussions were held with a party that indicated interest but had not signed an NDA. *Id*. at 10. That party declared that they were not interested in executing an NDA or pursuing this opportunity further. *Id*. RPA had a phone call scheduled with the final party that executed an NDA for a specific time on March 13, 2017, but the party failed to answer the call at the agreed upon time and has not returned the call. *Id*. at 11. The three parties that executed NDAs so far have failed to move forward. *Id*. at ¶ 12. Accordingly, the Debtors and RPA have concluded that the DIP Financing offered by the DIP Lender is the only available form of financing that will meet the Debtors' needs. *Id*.

21. The DIP Financing offered by the DIP Lender is on reasonable market terms, consistent with those negotiated between unaffiliated parties, with interest rates and fees at or below market for similar types of credit. *See* Cummins Decl. at ¶ 13.

22. The DIP Lender's agreement to provide the DIP Facility is specifically contingent on, *inter alia* (i) assumption of the Amended PPA; (ii) the entry of a final order approving Lightning Dock's execution and delivery of the Repowering Contracts by April 15, 2017; and (iii) the payment of certain fees and charges set forth in the DIP Facility documents.

23. The agreement shall be in substantially the form attached hereto as **Exhibit D** (the "DIP Financing Agreement") and is incorporated herein by reference. For ease of reference, set forth below are the principal terms of the DIP Facility: [3]

---

[3] This summary of the DIP Facility is intended to assist the Court in understanding key aspects of the arrangement and is qualified in its entirety by reference to the DIP Financing Agreement attached hereto as **Exhibit B**. All

| | |
|---|---|
| <u>Borrowers</u>: | Debtors Lightning Dock Geothermal HI-01, LLC and Los Lobos Renewable Power, LLC |
| <u>DIP Lender</u>: | Cyrq Energy, Inc. |
| <u>Commitment, Availability, and Purposes</u>: | • Interim term loan commitment (the "<u>Interim DIP Facility</u>") of $700,000.00, plus interest and fees (the "<u>Interim Amount Limit</u>"), available upon entry of the Interim Order, to be used for general working capital needs of the Debtors in accordance with the Budget pending entry of a Final Order (as defined below). *See* DIP Financing Agreement § 2.1(a); Interim Order ¶ 3. |

• Aggregated term loan commitment of $32.5 million, plus interest and fees, available upon entry by the Bankruptcy Court of a final, non-appealable order satisfactory to the DIP Lender in its sole discretion approving the DIP Facility, which shall generally be available for the following purposes (subject to the Budget):

  o $25.5 million to cover the cost of Repowering the Plant;

  o $2.0 million to cover operating deficits and necessary capital expenditures pending completion of the Repower; and

  o $5.0 million to cover administrative expenses of these Chapter 11 Cases, including professional fees, U.S. Trustee fees and taxes, any necessary adequate protection payments as ordered by the Court, expenses payable under the Amended PPA, and other expenses.

  *See* DIP Financing Agreement §§ 2.1(b), 3.6; Final Order ¶ 3.

| | |
|---|---|
| <u>Collateral and Carve-Out</u>: | All obligations of the Debtors under the DIP Facility shall be secured by (a) first-priority blanket Liens and security interests on all assets that are not subject to existing valid, perfected, unavoidable security interests as of the Petition Date including without limitation (subject to a Final Order) the Debtors' Avoidance Actions and the proceeds thereof (collectively, the "<u>DIP Facility Senior Liens</u>"); and (b) junior Liens and security interests on all assets that are subject to existing valid, perfected, unavoidable security interests (such Liens and security interests, together with the DIP Facility Senior Liens, collectively, the "<u>DIP Facility Liens</u>"), and (c) super-priority administrative expense claims against the Debtors' bankruptcy estates (the "<u>Superpriority Claims</u>"). The DIP Facility Liens shall be entitled to the benefits and protections of the appropriate provisions of Section 364 of the Bankruptcy Code. DIP |

capitalized terms not otherwise defined in this description have the meanings given to them in the DIP Financing Agreement.

Financing Agreement §§ 3.8, 6.2; Interim Order ¶¶ 7-8, 10.

The Debtors' unencumbered property which will be subject to the DIP Facility Senior Liens includes, without limitation, Lightning Dock's right title and interest in, to and under the Amended PPA; (ii) Lightning Dock's leases of geothermal resources and related surface access rights; (iii) approximately 158 acres of real property surrounding the Plant; and (iv) the Debtors' bank accounts and cash therein.

Without limiting the generality of the foregoing, upon entry of the Final Order, the foregoing liens shall be subject to (x) all accrued and unpaid fees that arise pursuant to 28 U.S.C. §1930, plus (y) the payment of allowed and unpaid fees of professionals retained in the Chapter 11 Cases that are incurred after the delivery of a written notice of the occurrence of one or more Events of Default in an amount not to exceed $50,000, plus (z) any allowed accrued unpaid fees and expenses owed to professionals retained in the Chapter 11 Cases (regardless of when allowed) that were accrued on or before the date of delivery by the DIP Lender to the Debtors of a written notice of the occurrence of one or more Events of Default to the extent consistent with the Budget ((x), (y) and (z), collectively, the "Carve-Out").  *See* DIP Financing Agreement § 11.2

Budget:                    The initial budget of sources and uses of cash substantially in the form annexed hereto as **Exhibit C**, as such budget may be amended from time to time in accordance with the terms of the DIP Financing Agreement subject to approval by the Lender in its reasonable discretion.  Aggregate disbursements shall not exceed 110% of the aggregate amount of projected disbursements for the period covered by the Budget ("Permitted Variance").  *See* DIP Financing Agreement §§ 3.6, 6.5; Interim Order ¶ 16.

Term:                      Unless otherwise agreed by the DIP Lender, borrowings shall be repaid in full, and the DIP Facility shall terminate and any amounts loaned thereunder (plus interest and other fees and charges) become immediately due and payable in full (the "DIP Expiration Date"), on the earliest of (i) December 31, 2018; (ii) April 15, 2017, if a Final Order has not been entered by the Bankruptcy Court by such date, unless the Interim Order has been extended with Lender's written consent to a date acceptable to Lender; (iii) the date the Interim Order expires, unless the Final Order shall have been entered and become effective by such date; (iv) the date a plan of reorganization in the Chapter 11 Cases becomes effective, (v) the date of the sale, transfer or other disposition of all or substantially all of the assets of any Borrower; or (vi) the date on which the Loans are accelerated pursuant to an Event of Default.  *See* DIP Financing Agreement § 2.7.

| | |
|---|---|
| <u>Closing Date</u>: | Closing Date for the DIP Facility is to occur upon the satisfaction of certain conditions, including, without limitation, entry of the Interim Order no later than five business days after the Petition Date. |
| <u>Interest Rate</u>: | 7.0% per annum. *See* DIP Financing Agreement § 2.6(a) |
| <u>Default Interest Rate</u>: | 9.0% per annum. *See* DIP Financing Agreement § 2.6(b) |
| <u>Commitment Fee</u>: | 3.0% of the total Commitment under the DIP Facility, which shall be fully earned, payable, and deemed paid with a draw on the DIP Facility on the Closing Date. *See* DIP Financing Agreement § 2.5(a) |
| <u>Unused Line Fee</u>: | For the period from and including the Closing Date to and excluding the DIP Expiration Date equal to (i) the average of the daily excess of the Commitment over the aggregate principal amount of the Loans multiplied by (ii) 0.375% per annum, computed on the basis of a 365-day year and payable monthly in arrears and deemed paid with a draw on the DIP Facility on the last Business Day of each month and on the DIP Expiration Date. *See* DIP Financing Agreement § 2.5(b) |
| <u>506(c) Waiver</u>: | Effective upon entry of the Final Order, no costs or expenses of administration shall be imposed upon the DIP Lender or any of the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of the DIP Lender, and no such consent shall be implied from any action, inaction or acquiescence by the DIP Lender. *See* Final Order at ¶ 26. |
| <u>Conditions to Initial Loans</u>: | The obligation of the DIP Lender to fund the Initial Loan shall be subject to following conditions precedent: |

- <u>Loan Documents</u>.  There shall have been delivered to Lender an executed counterpart of the DIP Financing Agreement.

- <u>Interim Order and PPA Assumption Order</u>.  The Bankruptcy Court shall have entered the Interim Order and PPA Assumption Order on or prior to 11:59 p.m. (Albuquerque, New Mexico time) on the date that is five business days after the Petition Date.

- <u>No Litigation</u>.  There shall exist no claim, action, suit, investigation, litigation or other proceeding, pending or threatened, in any court or before any arbitrator or Governmental Authority which relates to the DIP Facility, the Loans or the Loan Documents or which, individually or in the aggregate, in the sole opinion of the DIP Lender, could, if adversely determined, have any reasonable likelihood of having a Material Adverse Effect.

|   |   |
|---|---|
|   | • **Other Matters**.  DIP Lender shall have received and shall be satisfied with all such other agreements, instruments, documents, certificates and other matters as any of them may reasonably request.  *See* DIP Financing Agreement § 4.1 |
| Conditions to All Subsequent Loans: | The obligation of Lender to make any Subsequent Loan shall be subject to the prior or concurrent satisfaction of each of the conditions precedent set forth below. |
|   | • **Final Order**.  The Bankruptcy Court shall have entered the Final Order on or prior to 11:59 p.m. (Albuquerque, New Mexico time) on April 15, 2017. |
|   | • **Status of Final Order**. (i)  The Final Order shall remain in full force and effect, and shall not have been vacated, reversed, stayed, amended, supplemented or otherwise modified (without the consent of Lender), (ii) no motion for reconsideration of the Final Order shall be pending,  (iii) no appeal of the Final Order shall be pending, and (iv) the Final Order shall not be the subject of a stay pending appeal or a motion for a stay pending appeal. |
|   | • **Repowering Contracts**.  The Bankruptcy Court shall have entered an order approving Lightning Dock's execution and delivery of the Repowering Contracts by April 15, 2017, or such other date as the Lender agrees in writing, and from which no appeal or motion to reconsider has been timely filed (or any such appeal or motion has been conclusively resolved in favor of the Debtors) and such order is in any respect not subject of a stay pending appeal. *See* DIP Financing Agreement § 4.3 |
| Conditions to All Loans: | The obligation of Lender to make any Loan (including the Initial Loans) shall be subject to following conditions precedent: |
|   | • **Status of PPA Assumption Order**.  The PPA Assumption Order shall be effective, and shall not have been terminated or expired, (i) the PPA Assumption Order shall remain in full force and effect, and shall not have been vacated, reversed, stayed, amended, supplemented or otherwise modified (without the consent of Lender), (ii) no motion for reconsideration of the PPA Assumption Order shall be pending, (iii) no appeal of the PPA Assumption Order shall be pending, and (iv) the PPA Assumption Order shall not be the subject of a stay pending appeal or a motion for a stay pending appeal. |
|   | • **Bankruptcy Court Orders**.  All orders entered by the Bankruptcy Court related to or in connection with the DIP Financing Agreement, including, but not limited to, the Interim Order, the Final Order, and |

the PPA Assumption Order shall be in form and substance satisfactory to Lender in its sole discretion.

- Notice.  Lender shall have received a Loan Request.

- No Default.  At the time of and immediately after giving effect to such Loans the application of the proceeds thereof, no Default shall have occurred and be continuing on such date.

- Representations and Warranties.  Each of the representations and warranties made by Borrowers set forth in Article III of the DIP Financing Agreement or in any other Loan Document shall be true and correct in all material respects on and as of the date of such Loan the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date.

- No Legal Bar.  No order, judgment or decree of any Governmental Authority shall purport to restrain Lender from making any Loans to be made by it or otherwise to consummate the Transactions.  *See* DIP Financing Agreement § 4.2

Events of Default:    The following shall constitute Events of Default under the DIP Facility:

- default shall be made in the payment of any principal of or interest on any Loan or in the payment of any Fee or other amount due under any Loan Document, in each case when and as the same shall become due and payable, whether at the due date thereof or by acceleration thereof or otherwise;

- any representation or warranty made or deemed made in any Loan Document, or any representation or warranty contained in any, certificate, or other document furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

- the Bankruptcy Court shall fail to enter the Interim Order and the PPA Assumption Order by 11:59 p.m. (Albuquerque, New Mexico time) on the date that is five business days after the Petition Date.

- the Bankruptcy Court shall fail to enter the Final Order by 11:59 p.m. (Albuquerque, New Mexico time) on April 15, 2017;

- a Change of Control shall have occurred;

- the Power Purchase Agreement shall be terminated, or any event of

12

default occurs under the Power Purchase Agreement on account of which PNM may terminate the Power Purchase Agreement;

- relief from the stay has been granted to permit the SDNY Litigation, the London Arbitration, or any other litigation against one or more Debtors to commence or proceed;

- the occurrence of any default under the Repowering Contracts;

  - entry of an order vacating, reversing, staying, amending, supplementing or otherwise modifying a Repowering Order.

  - the occurrence of any post-Petition judgments, liabilities or events that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect;

  - default shall be made in the due observance or performance by any Debtor of any covenant, condition or agreement contained in Section 5.1(a), 5.2, 5.6 or in Article VI of the DIP Financing Agreement;

  - default shall be made in the due observance or performance by any Debtor of any covenant, condition or agreement contained in any Loan Document (other than those expressly identified in Section 8.1 of the DIP Financing Agreement) and such default shall continue unremedied or shall not be waived for a period of ten (10) days after written notice from Lender to Borrowers;

  - the occurrence of any of the following in any of the Chapter 11 Cases:

  - the entry of an order or ruling (which has not been withdrawn, dismissed or reversed): (w) to obtain additional financing under section 364 of the Bankruptcy Code not otherwise permitted pursuant to the DIP Financing Agreement; (x) to grant any Lien other than Permitted Liens and the Carve-Out upon or affecting any Collateral without the prior written consent of Lender; or (y) to use cash collateral of Lender under section 363(c) of the Bankruptcy Code except as provided in the Final Order;

  - the entry of an order in any of the Chapter 11 Cases confirming a Chapter 11 plan of reorganization that does not provide for (a) the termination of the Commitment and (b) the payment and satisfaction in full of all Obligations;

- the entry of an order approving the sale of substantially all of Lightning Dock's assets in any of the Chapter 11 Cases that does not provide for (a) the termination of the Commitment and (b) the payment and satisfaction in full of all Obligations;

- the entry of an order amending, supplementing, reversing, staying for a period in excess of fifteen (15) days, vacating or otherwise modifying the Loan Documents, the Interim Order, the PPA Assumption Order or the Final Order without the written consent of Lender or the filing of a motion for reconsideration with respect to the Interim Order, PPA Assumption Order or Final Order;

- the entry of an order allowing any claim or claims under section 506(c) of the Bankruptcy Code or otherwise against Lender or any of the Collateral;

- the appointment of an interim or permanent trustee in any of the Chapter 11 Cases or the appointment of a receiver or an examiner in any of the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, the reorganization of any Debtor (powers beyond those set forth in Sections 1106(3) and (4) of the Bankruptcy Code) (or any Debtor seeks or acquiesces in such relief);

- the dismissal of any of the Chapter 11 Cases, or the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or any Debtor shall file a motion or other pleading seeking the dismissal or conversion of any of the Chapter 11 Cases;

- the entry of an order in any of the Chapter 11 Cases avoiding or requiring disgorgement of any portion of the fees or other payments made on account of the Obligations pursuant to Loan Documents;

- the Bankruptcy Court shall enter an order granting relief from, or modifying, the automatic stay under section 362 of the Bankruptcy Code (i) to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) or any enforcement or remedial action against or on any Collateral or (ii) with respect to any lien on or the granting of any lien on any assets of the Debtors to any state or local environmental or regulatory agency or authority, which in either case have an aggregate value in excess of $100,000;

14

- the failure of any Debtor to perform any of its obligations under the Interim Order or Final Order, which materially and adversely affects the interests of Lender, as determined by Lender in its sole discretion; or

- except as otherwise provided by the Final Order and other than the Carve Out, the entry of an order in any of Chapter 11 Cases granting any other superpriority administrative claim or lien equal or superior to those granted to Lender; or

- other than (a) payments authorized by the Bankruptcy Court (i) in respect of accrued amounts and related expenses under the O&M Agreement or (ii) in respect of certain creditors, in each case to the extent authorized by one or more "first day" orders reasonably satisfactory to Lender, (b) payments authorized by the Bankruptcy Court with respect to any settlement or other stipulation with any creditor of any Borrower, other than Lender, as adequate protection or otherwise individually or in the aggregate not in excess of $10,000 for any and all such creditors unless approved in writing by Lender; or (d) as otherwise contemplated by the Budget, any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition indebtedness or payables of a Debtor.

*See* DIP Financing Agreement § 8.1

| | |
|---|---|
| <u>Costs and Expenses;</u><br><u>Indemnification:</u> | Debtors shall pay to the Lender all reasonable costs and out-of pocket expenses, including legal and other professional fees, incurred by the Lender in connection with, arising out of, or related to the DIP Financing Agreement and the conduct of the Chapter 11 Cases, including without limitation the costs of (i) the preparation, closing and administration of the DIP Financing Agreement and any requests by the Debtor concerning the DIP Financing Agreement or its administration, including any waiver, extension or consent hereunder or any amendment thereof or any Event of Default or alleged Event of Default thereunder; (ii) enforcing or defending any of the Lender's rights thereunder, including but not limited to, any action taken to enforce anything the Debtor is obligated to do thereunder; and (iii) any Event of Default and collection and other enforcement proceedings resulting therefrom, including any action taken to preserve, protect, sell or otherwise dispose of any Collateral and any action taken to defend the Lender concerning the Collateral or on account of any action it may take to enforce any right under the DIP Financing Agreement or any right to any Collateral. *See* DIP Financing Agreement § 9.3(a); Interim Order ¶ 26 |

Debtors agree, jointly and severally, to indemnify Lender (and any sub-agent thereof), and each Related Party of any of the foregoing Persons

(each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities (other than any Taxes) and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee) incurred by any Indemnitee or asserted against any Indemnitee by any Person (including any Borrower) other than such Indemnitee and its Related Parties arising out of, in connection with, or as a result of (i) the execution or delivery of the DIP Financing Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by any Borrower or any of its Subsidiaries, or any Environmental Claim related in any way to any Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by a Borrower against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if such Borrower has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction. *See* DIP Financing Agreement § 9.3(b)

The Debtors believe that the terms and conditions of the proposed DIP Facility are fair and reasonable under the circumstances and that entering into and performing under the DIP Financing Agreement is in the best interests of their estates and creditors.

24.     As set forth above, the Debtors, with the assistance of their professionals, worked diligently to identify other sources of financing to determine if they could obtain post-petition financing on terms or conditions more favorable than those contained in the proposed DIP Facility. None of those proposed lenders, however, were able to provide an offer for financing on terms that were as or more favorable than those contained in the DIP Facility. Accordingly,

the Debtors believe that the proposed DIP Facility represents the best alternative available to address their post-petition capital needs.

## IV. Relief Requested

25.     By this Motion, the Debtors respectfully request entry of interim and final orders, pursuant to sections 105, 363, 364 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014 (a) approving the DIP Financing Agreement, (b) authorizing the Debtors to obtain post-petition financing on a secured, super-priority basis on the terms and conditions set forth in the DIP Financing Agreement, (c) authorizing the Debtors to grant liens and security interests on their assets as contemplated by the DIP Financing Agreement, (d) authorizing the Debtors to pay certain fees to the DIP Lender in accordance with the terms of the DIP Financing Agreement, and (e) granting related relief.

## V. Argument

### A.     The Debtors' Need for Post-Petition Financing

26.     The Debtors believe that it is essential that they immediately obtain post-petition financing.  The relief requested herein will enable the Debtors to continue their ordinary course, day-to-day operations, to preserve the value of their estates, and, most importantly, to commence the Repowering of the Plant in accordance with the schedule set forth in the Amended PPA.  If the DIP Facility is not approved, the Repowering will not proceed, the Amended PPA may be terminated, and the value of the Plant (and the Debtors) as a going concern will be compromised.

27.     Section 364 of the Bankruptcy Code "provides bankruptcy courts with the power to authorize post-petition financing for a Chapter 11 debtor-in-possession," *See In re Defender Drug Stores, Inc.*, 126 B.R. 76, 81 (Bankr. D. Ariz. 1991).  "Having recognized the natural reluctance of lenders to extend credit to a company in bankruptcy, Congress designed [section] 364 to provide 'incentives to the creditor to extend post-petition credit.'"  *Id*.  In particular,

section 364(c) of the Bankruptcy Code establishes the conditions under which a debtor may obtain certain types of secured credit and provides, in pertinent part, as follows:

> (c)    If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —
>
> > (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3)    secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

28.    Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

> (a)    the debtor is unable to obtain unsecured credit under section 364(b) (i.e., by granting a lender administrative expense priority);
>
> (b)    the credit transaction is necessary to preserve the assets of the estate; and
>
> (c)    the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above factors and holding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere."); *In re Ames Dep't Stores*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990).

### i. Credit Was Not Obtainable on Better Terms

29.     To show that the credit required is not obtainable on an unsecured basis or on better terms, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.* at 1088; *see also Ames*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

30.     As discussed above, to obtain post-petition financing, the Debtors and RPA approached several sophisticated, commercial entities about providing debtor-in-possession financing for operating expenses and the Repowering required to preserve the Amended PPA. None of those entities were willing to make a post-petition loan for the required amounts on better terms than the DIP Facility. As such, when considering all of the factors, the Debtors concluded that the DIP Facility was their best financing alternative. The Debtors' efforts to seek necessary post-petition financing satisfies the statutory requirements of section 364 of the Bankruptcy Code. *See*, *e.g.*, *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (debtor seeking financing under section 364(c) of the Bankruptcy Code made

acceptable attempt to obtain less onerous financing by speaking to several lenders that denied the loan request); *Ames*, 115 B.R. at 40.

### ii. The DIP Facility is Necessary to Preserve Assets of the Estates

31.     It is essential that the Debtors obtain the financing required to continue, among other things, the orderly operation of the Debtors' businesses and to make certain capital expenditures and satisfy certain working capital requirements of the Debtors' businesses. Specifically, it is essential that the Debtors obtain immediate financing to commence work under the Repowering Contracts required to preserve the Amended PPA. The success of these cases depends upon the preservation of the Debtors' relationship with PNM, and that relationship in turn depends upon financing to immediately commence work under the Repowering Contracts.

### iii. The Terms of the DIP Facility Are Fair, Reasonable and Appropriate

32.     As discussed above, the terms and conditions of the proposed DIP Facility are fair and reasonable under the circumstances and are superior to the terms of any alternative financing available to the Debtors. The interest rates and other covenants negotiated with the DIP Lender are reasonable, and the terms of the DIP Facility were highly negotiated in the context of the overall transactions contemplated by the Repowering Contracts and the Amended PPA. Moreover, the other terms and conditions of the proposed DIP Facility are more favorable to the Debtors than any other alternative financing available to the Debtors.

33.     The mere fact that the DIP Lender is an insider of the Debtors does not undermine this conclusion. This Court has approved a sale of a debtor's assets to an insider under section 363 of the Bankruptcy Code, which requires findings of reasonableness, fairness and good faith analogous to those applied under section 364. *See In re Moreno*, 554 B.R. 504, 510-11 (Bankr. D. N.M. 2016) ("There is no prohibition against the sale of bankruptcy estate property to an insider" and such sale should be approved if "the Trustee has been unable to find another buyer

despite diligent efforts").  The Court may likewise approve the instant DIP Facility if it is the only fair and reasonable financing option available to the Debtors after diligent inquiry.

### iv.    Application of the Business Judgment Standard

34.    As described above, after appropriate investigation and analysis, the Debtors' management has concluded that the DIP Facility provides the best alternative available in the circumstances of these cases.  Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"); *cf. Group of Inst. Investors v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding the rejection or assumption of a lease is left to the business judgment of the debtor). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

35.    The Debtors have exercised sound business judgment in determining that a post-petition credit facility is both necessary and appropriate and have satisfied the legal prerequisites to incur debt under the DIP Facility.  The terms of the DIP Facility are fair and reasonable, and are in the best interests of the Debtors' estates.  The Debtors have reason to believe that the funds made available through the DIP Facility will be adequate to pay all administrative expenses due and payable during the post-petition periods, including amounts due under the Repowering Contracts during these Chapter 11 Cases.  Accordingly, the Court should grant the Debtors

authority to enter into the DIP Facility and obtain funds from the DIP Lender on the secured and administrative "superpriority" basis described above, pursuant to section 364(c) of the Bankruptcy Code.

## B.    Additional Relief to be Sought at Final Hearing

36.    The Debtors also intend to seek the following relief in connection with the DIP Facility to be approved at the Final Hearing and pursuant to the Final Order: (a) the DIP Lender shall not be subject to the equitable doctrine of "marshalling" or any similar doctrine; (b) none of the Loan Documents nor any other documents related to the transactions contemplated or reference therein, shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender any liability for any claims arising from the pre-petition or post-petition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts; and (c) the DIP Lender shall be granted a full lien on and security interest in the proceeds or property recovered from, the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code.  The Debtors submit that the foregoing requested relief is customary for debtor-in-possession financings of this nature and should be granted on a final basis.

## C.    Approval of the DIP Facility on an Interim Basis Is Necessary to Prevent Immediate and Irreparable Harm

37.    Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain post-petition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. Pro. 4001(c)(2).

38.     In examining requests for interim relief under the immediate and irreparable harm standard, court apply the same business judgment standard applicable to other business decisions.  *See, e.g., Ames Dep't Stores*, 115 B.R. at 36; *Simasko*, 47 B.R. at 449.  After the 14-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business.  *Ames Dep't Stores*, 115 B.R. at 36.

39.     Immediate and irreparable harm would result if the relief requested herein is not granted on an interim basis.  As described in detail herein and the Goodman Declaration, the Debtors have an immediate need to obtain access to liquidity to, among other things, continue to operate their businesses and satisfy other working capital and operational needs.  Funding each of these expenditures is necessary to preserve and maintain the value of the Debtors' estates for the benefit of all parties in interest.

40.     Accordingly, the Debtors request that, pending the Final Hearing, the Court schedule an interim hearing on the Petition Date or as soon thereafter as is practical to consider the Debtors' request for authorization to obtain interim financing up to the Interim Amount Limit under the DIP Facility.

**D.      Good Faith**

41.     The terms and conditions of the DIP Facility are fair and reasonable and were negotiated by the parties in good faith and at arms' length.  Therefore, the DIP Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the DIP Facility, or any order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

Case 17-10567-t11    Doc 16    Filed 03/14/17    Entered 03/14/17 18:49:05 Page 23 of 29

### E. Modification of the Automatic Stay Is Warranted

42. The Interim Order provides that the automatic stay provisions under section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Financing Agreement, and to take various actions without further order of or application to the Court. Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP Financing Agreement.

### F. Request for Final Hearing

43. Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2), the Debtors request that the Court set a date for the final hearing that is as soon as practicable, but in no event later than, 20 days following the Petition Date, and fix the time and date prior to the final hearing for parties to file objections to this Motion.

### VI. Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order

44. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a), the twenty-one-day stay provided for by Bankruptcy Rule 6003(b), and the fourteen-day stay provided for by Bankruptcy Rule 6004(h).

### VII. Notice

45. Notice of this Motion has been provided to: (a) the U.S. Trustee; (b) counsel to the proposed DIP Lender; (c) the creditors holding the twenty (20) largest unsecured claims against the each of the Debtors' estates, as identified in the Debtors' chapter 11 petitions; (d) known holders of pre-petition liens against the Debtors' property; counsel to Kaishan; and (e) all

parties that have filed a notice of appearance or have requested service in these Chapter 11 Cases. In light of the nature of the relief requested herein and the potential harm to the Debtors' estates if the relief requested herein is not granted, the Debtors submit that no other or further notice need be provided.

## VIII. <u>No Prior Request</u>

46.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court (a) grant the Motion; (b) enter the Interim Order; (c) enter the Final Order; and (d) grant to the Debtors such other and further relief as the Court may deem just or proper.

Dated: March 14, 2017                       WALKER & ASSOCIATES, P.C.
      Albuquerque, New Mexico

                      By:     */s/ Thomas D. Walker*            
                               Thomas D. Walker (NM Bar No. 3238)
                               500 Marquette NW, Suite 650
                               Albuquerque, New Mexico 87102
                               Telephone:  (505) 766-9272
                               Facsimile:  (505) 766-9287
                               Email:  twalker@walkerlawpc.com

                               *Proposed Attorneys for Debtors*
                               *and Debtors-in-Possession*

**EXHIBIT A**

**FORM OF INTERIM DIP ORDER**

## EXHIBIT B

## FORM OF FINAL DIP ORDER

**EXHIBIT C**

**BUDGET**

**EXHIBIT D**

**FORM OF DIP FINANCING AGREEMENT**